## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### NORTHERN DIVISION

MARK SHARRARD,

     *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant*.

_____/

CASE NO. 14-14212

DISTRICT JUDGE TERRENCE G. BERG
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 12, 14)

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Sharrard is not disabled. Accordingly, **IT IS RECOMMENDED** that Sharrard's Motion for Summary Judgment (Doc. 12) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 14) be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381 et seq. Title II. (Doc. 4; Tr. 117-28)[1]. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 12, 14).

_____

[1] The instant application for SSI benefits is Sharrard's second; his first application was denied on January 26, 2011. (Tr. 99-115).

Plaintiff Mark Sharrard was forty-four years old when he applied for benefits on October 31, 2011[2], alleging that he became disabled on September 22, 2009. (Tr. 164). This application was denied on February 28, 2012. (Tr. 134-39). Sharrard requested a hearing before an Administrative Law Judge ("ALJ"), which took place on March 1, 2013, before ALJ Patricia McKay. (Tr. 40-70). Sharrard, who was represented by attorney Andrea Pellegrini[3], testified, as did vocational expert ("VE") Pauline McEachin. (Tr. 40). On May 16, 2013, the ALJ issued a written decision in which he found Sharrard not disabled. (Tr. 20-35). On September 5, 2014, the Appeals Council denied review. (Tr. 1-3). Sharrard filed for judicial review of the final decision on November 2, 2014. (Doc. 1).

**B.      Standard of Review**

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

---

[2] The ALJ asserted in her decision that Sharrard's application date was October 31, 2011. (Tr. 26). Sharrard concurs with this assessment in his brief, (Doc. 12 at 8), as does the Commissioner (Doc. 14 at 2). A review of the transcripts reveals that Sharrard's actual application date was November 2, 2011. (Tr. 164). However, this discrepancy is irrelevant to the outcome of Sharrard's application, thus the Court will assume that the parties' agreed upon date, October 31, 2011, was the date of application.

[3] On appeal, Sharrard is represented by attorney Joshua L. Moore. (Doc. 12).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

**C.     Framework for Disability Determinations**

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least

3

twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## D.   ALJ Findings

Following the five-step sequential analysis, the ALJ found Sharrard not disabled under the Act. The ALJ found at Step One that Sharrard had not engaged in substantial gainful activity since October 31, 2011, the application date. (Tr. 26). At Step Two, the ALJ concluded Plaintiff had the following severe impairments: "restrictive lung disease, status post repair of

4

an atrial septal defect, history of cerebrovascular accident with right-sided residuals, human immunodeficiency virus (HIV) infection, hypertension, hyperlipidemia, bipolar disorder, generalized anxiety disorder, and history of substance abuse." (*Id*.). At Step Three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. 27-28). The ALJ then found that Sharrard had the residual functional capacity ("RFC") to perform light work, except that Sharrard

> needs the opportunity to alternate between sitting and standing while engaged in the work, as he desires. Additionally, the claimant must not be exposed to workplace hazards such as heavy machinery, vibration, climbing ladders, and unprotected heights. The claimant can only occasionally climb stairs, crouch, crawl, kneel, stoop, and bend. The claimant must avoid environments with pulmonary irritants, such as dust, fumes, and odors. The claimant can frequently use his dominant right upper extremity for fingering and feeling but only occasionally for grasping or gross manipulation, and he can frequently use his right lower extremity for foot controls. The claimant can perform simple, unskilled work with only occasional interaction with the general public and co-workers.

(Tr. 28-33). At Step Four, the ALJ noted that Sharrard had not presented any new evidence regarding his past relevant work, and thus adopted the decision as to prior work rendered in Sharrard's 2011 hearing before an ALJ. (Tr. 33). At Step Five, the ALJ found that a significant number of jobs existed which Sharrard could perform despite his limitations. (Tr. 33-34). As a result, the ALJ found Sharrard not disabled under the Act. (Tr. 34).

### E.    Administrative Record

#### 1.    Medical Evidence

On November 21, 2009, Sharrard was seen by Dr. Ilonka Molano shortly after being diagnosed with HIV. (Doc. 390). Sharrard's CD4 count was 244 (presumably per copies per

5

mL), along with a viral load[4] of 61,938 (copies per mL), numbers sufficiently high that Dr. Molano asserted that therapy should start immediately to control the infection. (Tr. 391). Dr. Molano noted a history of depression, though Sharrard was not taking any drugs at that time to control that disorder. (*Id.*).

In a December 22, 2009, visit with Dr. Molano, Sharrard reported nausea with vomiting for the first two weeks of taking his anti-retroviral medication, along with headaches. (Tr. 392). Sharrard also noted that after taking some of his roommate's anti-nausea medication, his symptoms improved significantly. (*Id.*). Sharrard was found to have "[n]o joint abnormalities," and his physical condition was generally normal. (Tr. 392).

On January 22, 2010, Dr. Samina Ghazi found that Sharrard had stable hypertension, HIV, and anxiety. (Tr. 271).

On February 2, 2010, Dr. Molano noted that Sharrard was started on antiretroviral therapy to treat his HIV infection approximately one month prior, and that Sharrard reported "doing very well" on that medication, with only occasional nausea explained by alcohol consumption. (Tr. 390). Dr. Molano noted that Sharrard had been "excellent" in complying with his medication regimen, and that he experienced a "very good response to therapy." (*Id.*).

---

[4] "HIV viral load tests are reported as the number of HIV copies in a milliliter (copies/mL) of blood. If the viral load measurement is high, it indicates that HIV is reproducing and that the disease will likely progress faster than if the viral load is low. During treatment and monitoring, a high viral load can be anywhere from 5,000 to 10,000 copies/mL. Initial, untreated, and uncontrolled HIV viral loads can range as high as one million or more copies/mL. A low viral load is usually between 40 to 500 copies/mL, depending on the type of test used. This result indicates that HIV is not actively reproducing and that the risk of disease progression is low (taken from: www.labtestsonline.org)." *Stroud v. Comm'r of Soc. Sec.*, No. CIV.A. 10-12515, 2011 WL 4576032, at *3 (E.D. Mich. July 25, 2011).

On June 25, 2010, Dr. Ghazi diagnosed right shoulder pain from a rotator cuff, acid reflux, and anxiety. (Tr. 269).

On July 23, 2010, Dr. Ghazi noted that Sharrard had difficulty pulling up his pants, and found right shoulder pain, acid reflux, weakness on the right side, HIV, a torn rotator cuff on the right shoulder, and depression. (Tr. 267).

On August 6 and 31, 2010, Dr. Ghazi made a series of observations which are largely illegible due to poor penmanship and scanning quality. (Tr. 265-66).

On October 29, 2010, Dr. Ghazi recorded complaints of hand and back pain that had increased in the past three or four years. (Tr. 264).

On September 21, 2010, Sharrard visited Royal Oak Hospital ("Royal Oak") for a follow-up to exams previously performed at another medical center. (Tr. 259). Dr. Paul Chittick found that Sharrard reported body aches, intermittent hot flashes, and diarrhea following treatment for HIV. (*Id.*). On physical examination, Dr. Chittick found Sharrard to appear generally normal. (Tr. 260). Dr. Chittick further found that Sharrard's "labs have been reviewed from the previous records that showed CD4[5] count of 224. His viral load was noted to be 812 from April 2010 with an undetectable viral load and supposedly well controlled." (*Id.*).

On December 28, 2010, Sharrard visited Dr. Ghazi complaining of influenza and right hip pain so severe that it "feels like it might fall out of its joint." (Tr. 263).

---

[5] "CD4 is an infection-fighting white blood cell that coordinates the immune response. HIV infects and kills CD4 cells, weakening the immune system. CD4 count is a useful indicator of immune system health and HIV/AIDS progression. A normal CD4 count is approximately 500 to 1,400 cells/mm 3 of blood, but individual counts can vary." *Kelley v. Comm'r of Soc. Sec.*, No. 12-10002, 2013 WL 1187915, at *2 (E.D. Mich. Mar. 22, 2013) (quotation omitted).

On January 4, 2011, Sharrard "denied any active complaints," and Dr. Kalyani Movva found Sharrard's physical condition generally normal. (Tr. 419-20). However, Dr. Movva's impression reflected "[c]linically stable" HIV disease, hyperlipidemia, and bipolar disorder. (Tr. 421).

On January 18, 2011, Dr. Robert Grodman of Advanced Cardiovascular Health Specialists, P.C., examined Sharrard and found that he suffered from hypertensive cardiovascular disease, a history of atrial septal defect repair, and tobacco dependence. (Tr. 278).

On February 15, 2011, Dr. Datla Raju recorded that Sharrard's mental state was normal except for somewhat impaired judgment skills. (Tr. 338). Sharrard denied suicidal ideation. (*Id.*). Also on February 15, 2011, Dr. Movva recorded "somatic complaints including a few episodes of bowel incontinence, lower back pain and right hip pain, which he felt might be resulting from [his anti-retroviral therapy]." (Tr. 428). Sharrard also noted that he was feeling "somewhat depressed" and that while he had in the past acted as a caretaker for his roommate, the roles had reversed because of Sharrard's "pain and debility." (*Id.*). Sharrard stated that he experienced only two episodes of bowel incontinence since 2009, without any ongoing symptoms. (*Id.*). He also noted chronic, constant lower back pain, which worsened in the recent past, but denied radiation, pain, or weakness in the lower extremities. (*Id.*). Sharrard stated that his primary care physician increased his dosage of Vicodin because his prior dose was not providing adequate pain relief. (*Id.*). On physical examination, Dr. Movva found that Sharrard's condition was generally normal. (Tr. 430). Finally, Sharrard stated that he was "tolerating well" his anti-retroviral therapy. (Tr. 431).

8

On March 29, 2011, Dr. Movva noted that Sharrard had been "100% compliant" with his HIV treatment, and had been taking Coumadin since he had a stroke at some prior date. (Tr. 435-36). On physical exam, Sharrard's condition was again found to be normal. (Tr. 437).

On April 12, Dr. Datla Raju found that Sharrard's mental state was generally normal; Dr. Kremer duplicated these results on June 3, 2011. (Tr. 319-26, 327-34). On June 3, social worker JudyLynn Donlan-Muncey also reviewed Sharrard's mental condition, and assigned a GAF score of between 60 and 65. [6] (Tr. 325).

On May 18, 2011, Sharrard for the first time visited Dr. Shyran Hines; the "chief complaint" during that visit was "changing doctors, need refill [on medication], pt. is HIV positive," and thus the appointment apparently did not involve any specific complaint of symptoms. (Tr. 292).

On June 21, 2011, Sharrard was seen by emergency room physician Dr. Christine Morrison for the treatment of chest pain with shortness of breath, the cause of which could not be determined through the use of an electrocardiogram. (Doc. 524).

On June 22, 2011, Dr. Hines noted that Sharrard went to the hospital the day prior for chest pain and blood work, but did not draft an assessment of Sharrard's condition, and the report from that date does not include any assessment or treatment plan. (Tr. 290-91). On July 27, 2011, Dr. Hines diagnosed petechiae on the stomach and arms. (Tr. 288-89). On October

---

[6] A GAF score of 51 to 60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." See *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association, 4th ed. text rev. 2000) (DSM–IV–TR). A GAF score of 61–70 indicated, "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Id.*

9

20, 2011, Sharrard visited Dr. Hines for medication refills; under "assessment/treatment plan," Dr. Hines diagnosed back pain, among other disorders which are illegible. (Tr. 286-87).

On June 28, 2011, Sharrard told Dr. Movva of "ongoing muscle aches in the legs and lower back," along with anxiety and diarrhea three to four times weekly, a substantial increase from his February 15, 2011 report of experiencing diarrhea only a few times in several years. (Tr. 428, 442). His physical condition was again nominal. (Tr. 444). Dr. Movva encouraged Sharrard to seek evaluation for his chronic back pain. (Tr. 445).

On July 1, 2011, Sharrard treated with Dr. Carole Kremer at Easter Seals Michigan, Inc. (Tr. 310-18). She found Sharrard's affect to be constricted, his mood depressed and anxious, his thought content obsessive and compulsive with ideas of reference, and his attention, concentration, and judgment impaired. (Tr. 312). Sharrard reported that he became angry to the point of violence when not taking his medication Seroquel, and thus began taking that medication again. (Tr. 313). Sharrard denied suicidal ideation. (Tr. 314). Dr. Kremer assigned a GAF score of between 60 and 65. (Tr. 317).

On August 26, 2011, Sharrard again treated with Dr. Kremer. (Tr. 301-09). Dr. Kremer noted that Sharrard was taking a large number of medications to treat chest pain, HIV, depression, acid reflux, high blood pressure, and pain, and was always consistent in taking that medication. (Tr. 301-03). Sharrard's attitude was anxious, and he expressed suicidal ideation without a plan, lasting one day, as a result of his friend's death; Dr. Kremer noted that Sharrard "snaopped [sic] right out of it" after taking an extra dose of his schizophrenia medication. (Tr. 304).

10

On September 27, 2011, Sharrard denied abdominal pain or "any other active symptoms at this time." (Tr. 450). Again, his physical exam showed normal results. (Tr. 452). Dr. Movva noted that Sharrard showed "excellent virologic response" to his HIV treatment. (Tr. 455).

On October 14, 2011, Dr. Anupama Kottam prepared a transesophageal echocardiography report, which showed normal size, thickness, and systolic function in the left ventricle, no regional wall motion abnormalities, and a normal ejection fraction; the left atrium was normal in size; the right ventricle appeared "mildly dilated," and the right ventricular systolic function was mildly depressed; the right atrium was normal in size; the aortic root was normal, as were the main and pulmonary arteries; and there was no evidence of pericardial effusion. (Tr. 283). Sharrard's valves were generally normal, except for "[s]uboptimal tricuspid regurtitant jet Doppler velocity signal preclud[ing] reliable estimation of pulmonary artery systolic pressure." (*Id.*). Dr. Kottam also found "[r]edundant fossa ovalis" and the suggestion of "an interatrial shunt, most consistent with a small-moderate patent foramen ovale." (Tr. 284).

On November 16, 2011, Sharrard was seen by Dr. Jack Belen, who evaluated his abnormal spirometry. (Tr. 361). Sharrard denied any history of chest pain, orthopnea or paroxysmal nocturnal dyspnea, fever, chills, or sweats. (*Id.*). Dr. Belen also noted no history of asthma, bronchitis, tuberculosis, pulmonary embolism, thrombophlebitis, or pneumothorax. (*Id.*). On physical exam, Sharrard was found to be in generally normal condition. (Tr. 362). Dr. Belen concluded that "[c]omplete pulmonary function studies were performed and did demonstrate the presence of a moderate restrictive defect although his diffusing capacity was

11

normal," with the most likely explanation for this abnormality being Sharrard's prior open heart surgery. (*Id*.). Dr. Belen also noted that Sharrard "is currently disabled." (Tr. 361).

On November 18, 2011, Sharrard again treated with Dr. Kremer. (Tr. 293-300). Sharrard told Dr. Kremer that he was experiencing greater depression and anxiousness, and requested an increase in his dosage of medication to treat that issue. (Tr. 295). Sharrard reported satisfactory sleep and appetite. (*Id*.). Dr. Kremer recorded that Sharrard's appearance and emotional state was generally normal except for a blunt affect. (Tr. 296-97). Dr. Kremer recorded diagnoses of bipolar I disorder, generalized anxiety disorder, episodic cocaine dependence, benign hypertension, and unspecified angina pectoris, assessed a GAF score of 60, and recorded that Sharrard's status was stable. (Tr. 299).

On January 24, 2012, Sharrard again "[d]enied any complaints" to Dr. Movva, asserted that he was fully compliant with his anti-retroviral treatment, and said he had "no active issues." (Tr. 459).

On April 24, 2012, Dr. Movva again noted perfect compliance with anti-retroviral drugs; Sharrard had "no active issues," and did note feeling depressed, but not to the point of suicide. (Tr. 470). Dr. Movva found "no issues of intolerance" with Sharrard's HIV treatment, and that his "health maintenance issues have been addressed."  (Tr. 475). Dr. Movva also noted that Sharrard's hyperlipidemia was well managed. (*Id*.).

On April 30, 2012, Dr. Jack Belen found that Sharrard suffered from "[d]yspnea upon exertion, probably secondary to his known restrictive lung disease felt to be secondary to his cardiac surgery as well as a component of COPD," and noted that Sharrard "[u]nfortunately . . . continues to smoke . . . half a pack [of cigarettes] a day." (Tr. 359-60).

On May 4, 2012, Sharrard visited with Dr. Kremer, who noted complaints of racing thoughts, cocaine use, and bipolar symptoms. (Tr. 555). She found that Sharrard's mental status was generally normal, except that he appeared anxious and depressed, and that he exhibited some ideation of suicide, but without a plan. (Tr. 557).

On July 20, 2012, Sharrard visited with emergency room physician Dr. Briana Ponto, reporting that he "wanted to kill himself today" as a result of his receiving "a letter in the mail stating that his insurance was going to be cut off, and [because] he was recently rejected from obtaining disability," . . . "he will be unable to afford his HIV medications which inevitably means that he will die." (Tr. 533). Aside from a small rash, Sharrard "denie[d] any other complaints." (*Id.*). Sharrard was alert, oriented to time, place, person, and situation, was calm and cooperative, and was in no respiratory distress. (Tr. 539). He spent a night in the hospital, and on July 21, Dr. Lester Potempa recorded that Sharrard was "much more settled," was "pleasant and conversant" and "report[ed] no suicidal ideations." (Tr. 540). In terms of mental status, he found that Sharrard was depressed but without "escalating dysphoria," hallucinations, or "loose associations." (Tr. 541). He assessed a GAF score of 20.[7] Dr. Potempa also noted that in 1994 Sharrard underwent open heart surgery and experienced a stroke that left him with weakness on his right side. (Doc. 540).

On July 23, 2012, Sharrard was again seen by Dr. Potempa. (Tr. 544). He recorded that Sharrard denied suicidal intent, and was "much more settled" with a "much more pleasant demeanor," and recommended that Sharrard be released the following day. (*Id.*). He also noted

---

[7] A GAF score of eleven to twenty indicates some danger of hurting self or others (*e.g.*, suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene or gross impairment in communication (*e.g.*, largely incoherent or mute). DSM–IV–TR.

that Sharrard participated in group therapy sessions and "showed a quick settling affective instability." (Tr. 544).

On July 24, 2012, Dr. Potempa discharged Sharrard, finding that his suicidal ideation "quickly settled" once he arrived in the hospital, and that he was ready for discharge after "showing visual improvements," including "improved affective display and no evidence of any aberrant behaviors." (Tr. 545).

Also on July 24, 2012, Dr. Ronak Talati recorded that Sharrard "complains of diarrhea for over a year now. Says he has 4-5 [bowel movements] per day." (Tr. 482). Sharrard denied abdominal pain, bloody stool, or weight loss, and asserted that medication was ineffective in resolving his diarrhea. (*Id.*). Dr. Talati also suggested that Sharrard's diarrhea "may not be related to HIV," and recommended that he follow up with his general practitioner. (Tr. 488).

On July 31, 2012, Dr. Talati ordered an x-ray of Sharrard's chest, which showed "no acute process." (Tr. 505).

On August 2, 2012, Sharrard visited with Dr. Nicanor Castedo for a medication review, who recorded that he appeared depressed, his affect was constricted, and that his thinking was tangential. (Tr. 566). On September 11, 2012, Dr. Castedo found that Sharrard's mental condition was normal with the exception of constricted affect. (Tr. 574). On September 27, 2012, Dr. Castedo again noted that Sharrard appeared depressed and that his affect was constricted. (Tr. 582). On October 9, 2012, Dr. Castedo wrote that Sharrard appeared anxious, his affect constricted, and his attention was merely adequate. (Tr. 590). On November 8, 2012, Dr. Castedo stated that Sharrard was anxious and dysphoric, and that he had a flat affect. (Tr. 599).

14

On November 15, 2012, Dr. K.C.R. Nair conducted a psychiatric review of Sharrard. (Tr. 604). He recorded that Sharrard was currently feeling depressed, and in the past experienced "episodes of manic behavior with hypersexuality – with men, on the go, to have sex," which "consumes me." (Tr. 604). Sharrard also reported "many many episodes of hypomania, mostly seasonal in Spring. The mood changes of hypomania are 'almost like clockwork' and depression sets in during the Fall months." (*Id*.). Sharrard also detailed his two prior experiences in which he came close to suicide, once in 1989 and once in 2005. (*Id*.). Dr. Nair found that Sharrard appeared dysphoric and depressed, his psychomotor control was slowed, his attention impaired, but his thought process goal oriented. (Tr. 608-09). He assessed a GAF score of 39[8] "because suicidal thoughts, racing thoughts." (Tr. 612).[9]

On January 8, 2013, Dr. Talati found that Sharrard's diarrhea symptoms had resolved, and that Sharrard "hardly takes" anti-diarrheal medication, which he was prescribed. (Tr. 495). Dr. Talati also noted that Sharrard's "cd4 count was over 1000 in July 2012." (*Id*.). Dr. Talati also noted that on physical exam all results were normal. (Tr. 495-96).

On February 5, 2013, Dr. Castedor found that Sharrard's mood was anxious, his affect constricted, his thought processes tangential, and his attention adequate. (Tr. 619).

---

[8] A GAF score of 31 to 40 indicates some impairment in reality testing or communication OR major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (*e.g.*, depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). DSM–IV–TR.

[9] There is some confusion regarding which physician assigned this GAF score. It appears within a November 15, 2012, transcript created during a visit with Dr. Nair. (Tr. 604). The GAF score appears on a page within that transcript reading "diagnosis made by C. Kremer, D.O." on "effective date 11/18/2011." (Tr. 612). It thus appears that Dr. Nair's November 15, 2012, transcript refers back to the diagnosis Dr. Kremer made on November 18, 2011. However, an examination of Dr. Kremer's November 18, 2011, transcript reveals that on that date she assessed a GAF score of between 60 and 65. (Tr. 299). Thus it does not appear that Dr. Kremer assessed a GAF score of 39, but rather than Dr. Nair made that assessment and misattributed it to Dr. Kremer.

15

On February 6, 2013, Dr. Joel Kahn performed an examination of Sharrard, concluding that his emotional state, range of motion, neurological, psychological, and physical condition was normal, and noting "no symptoms." (Tr. 357-58).

On February 8, 2013, Dr. Kim Williams interpreted a coronary calcium scoring test of Sharrard's heart. (Tr. 352). Dr. Williams concluded that Sharrard's calcium calcification Agatston score was zero, putting him between the twenty-fifth and fiftieth percentile for men of Sharrard's age. (Tr. 352-53).

### 2. Application Reports and Administrative Hearing

### A. Sharrard's Function Report

Sharrard completed a function report on December 7, 2011. (Tr. 211-18). In that report, Sharrard indicated that he does not take care of pets or others. (Tr. 212). He asserted that his conditions prevent him from performing yard work, walking down a flight of stairs, or removing his shirt, and that he wakes up at night in pain. (*Id*.).  He reported that he required reminders to "wash up," brush his teeth, and take pills. (Tr. 213). He prepares sandwiches weekly, which takes two to three hours. (*Id*.). When asked to list the household chores he can perform, Sharrard listed only "loading dishwasher," which takes about an hour. (*Id*.). He reported that he cannot perform other household chores because he "get[s] lightheaded and chest pains." (Tr. 214). He goes outside twice weekly, and either drives a car or gets a ride; he can go out alone. (*Id*.). He shops in stores for food approximately two times monthly. (*Id*.). Apparently confused by a question in the form, Sharrard stated that he cannot pay bills or handle a savings account because he "ha[s] no money," but can count change and use a checkbook. (*Id*.). As to hobbies, he reported "looking through magazines" twice monthly, and

16

watching television daily. (Tr. 215). He reported being unable to perform yardwork because it "take[s] my breath away, make[s] me feel light headed sometimes I feel I might loose [sic] consciousness." (*Id.*).

Sharrard also reported not spending time with others. (*Id.*). Sharrard asserted that he goes to weekly therapy sessions and monthly luncheons with a community services organization, yet also asserted that he does not visit any location outside the home regularly. (*Id.*). He is able to go outside alone, and does not need reminders to go places. (*Id.*). He reported difficulty getting along with others because "its [sic] part of my bi-polar disorder." (Tr. 216). He also stated that he "do[esn't] get out to do things" socially because of his illnesses. (*Id.*). He stated that his conditions limit his ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, stair-climb, remember, complete tasks, concentrate, use his hands, and get along with others. (*Id.*). Sharrard asserted that he does not finish what he starts, has no trouble following written instructions, but does have some difficulty with verbal instructions because he sometimes forgets them. (Tr. 216). He gets along with authority figures "pretty well," and has not been laid off or fired because of problems getting along with others. (Tr. 217).

In an HIV-specific function questionnaire, Sharrard reported that he experiences fatigue that requires him to nap twice daily for an hour. (Tr. 235). His fatigue is brought on by concentration and manual labor. (*Id.*). He also asserted that he experiences diarrhea five to six times daily. (*Id.*). He reported not experiencing weight loss, incontinence, or night sweats. (Tr. 235-36). However, he reported waking up in pain every night; he also noted that several of his medications cause him to experience sleepiness. (Tr. 236). He reported requiring reminders to perform grooming, and must rest during grooming. (*Id.*). He requires help with laundry and

17

dishes, and cannot walk more than 100 feet without resting. (*Id*.). Regarding his mental state, Sharrard reported that he experiences depression on some days, and racing thoughts on other days. (Tr. 237). He does not have trouble with coughing, but experiences shortness of breath and lightheadedness after climbing stairs, in part because of restrictive lung disease. (*Id*.). Sharrard further stated that he has not attempted to work since he became ill, and did not lose his last job as a result of his conditions. (*Id*.).

A portion of that report was completed by Dr. Shyran Hines on May 7, 2011. (Tr. 240). Dr. Hines noted that Sharrard did not appear chronically ill, but did appear visibly fatigued. (Tr. 239). Dr. Hines also established an RFC, noting that Sharrard could lift ten pounds occasionally, stand or walk for less than two hours, and sit for less than six hours daily. (Tr. 239). Dr. Hines further noted that Sharrard's limited functional capacity resulted from "his congenital heart disease," rather than from his HIV infection, breathing issues, or other maladies. (*Id*.). Sharrard's T-Cell count was 888. (Tr. 240).

### B.    Sharrard's Testimony at the Administrative Hearing

At the March 1, 2013, hearing before the ALJ, Sharrard testified that he lives on the first floor of a house, and does not go into the basement to perform laundry because he "get[s] short winded going down a flight of stairs." (Tr. 49). Sharrard drove himself to the hearing. (Tr. 52). He stated that his average day consists of taking medication, sitting in the living room, laying down in bed, napping approximately twice daily for two hours each, watching television, using Facebook, and "surfing the net." (Tr. 52-55). Sharrard testified that he does not sleep at night. (Tr. 55). He also asserted that some of his medications "make me a little loopy" such that he is

unable to pay attention. (Tr. 52). Sharrard stated that he shops for food and other goods, that he does not have any hobbies whatsoever. (Tr. 55).

With regard to his breathing difficulties, Sharrard stated that his inhaler "is supposed to help," and appeared to agree with the ALJ's conclusion that it does provide some relief. (Tr. 56). Sharrard asserted that his HIV is "stable" but that he experiences diarrhea as a result of his medications approximately two days per week. (*Id.*). Sharrard further stated that, as a result of a stroke in 1994, he is only able to write with his right hand, and that his signature "is chicken scratches." (Tr. 57). However, he acknowledged that he retains sufficient dexterity in his right foot and leg to drive a vehicle. (Tr. 58). When asked why he is unable to work, Sharrard asserted that he is disabled "[b]ecause of the pain in my back and the shortness of breath I get." (*Id.*). He further claimed that his back pain resulted from arthritis. (*Id.*). Sharrard claimed that he experiences pain of six to seven out of ten severity on a daily basis, and that his back pain sometimes radiates into his legs. (Tr. 59). He asserted that he can stand for only five minutes, walk one-half block, bend or twist "sometimes," and lift only five pounds. (*Id.*). He also asserted that he has difficulty with putting his belt through its loops. (Tr. 62).

With regard to his mental conditions, Sharrard asserted that his bipolar and general anxiety disorders make him feel "[c]razy," and that the medications he takes for those conditions make him feel drowsy, and occasionally emotional. (Tr. 60-61). He also asserted that he feels anxious around others. (Tr. 62).

### C.    The VE's Testimony at the Administrative Hearing

The ALJ did not consider whether Sharrard could perform any of his past relevant work because he did not perform any work between the date of his prior, rejected application for

disability benefits, and his instant application. (Tr. 63). The ALJ then asked the VE to consider whether a hypothetical worker, who has the same education, age, and past work experience as Sharrard, could perform competitive work. (Tr. 64). Specifically, the ALJ asked the VE to hypothesize a person who has the ability to perform light work, and who is limited in the following manner:

> [H]e can lift and carry up to 20 pounds occasionally and 10 pounds frequently. He can stand and walk for six out of eight hours. He can sit for six of eight hours, but he needs the opportunity to alternate between sitting and standing as necessary. He can work in any environment, but he must not be exposed to hazards, such as heavy machinery and vibration, and mentally he can perform simple, unskilled work with only occasional interaction with the general public and coworkers. In addition to that, physically he must avoid environments with pulmonary irritants, which would be dust, fumes, odors, and he can occasionally climb stairs and crouch and crawl and kneel and stoop and bend, but I wouldn't want him to be exposed to other work place hazards, such as climbing ladders and unprotected heights. As the evidence indicates he can frequently use his right upper extremity, which is his dominant extremity, for fingering and feeling, but only occasionally grasping or gross manipulation, and he can frequently use his right lower extremity for foot controls.

(Tr. 64). The VE found that such a hypothetical worker could work as an inspector (3,000 jobs in the Lower Peninsula of Michigan), visual inspector (2,000 jobs), and sorter (2,000 jobs). (Tr. 65). The ALJ then asked whether, if limited to work at the sedentary level of exertion in addition to the aforementioned hypothetical limitations, a worker could maintain competitive employment; the VE testified that such a worker could still work as a surveillance systems monitor (2,000 jobs) or inspector (2,200 jobs). (Tr. 65-66). The VE also confirmed that each of these positions is simple, routine, and repetitive, and that none of the jobs would require more than occasional writing with the right upper extremity. (Tr. 66). The ALJ also asked whether a worker who is off task for more than twenty percent of the day could maintain competitive

employment; the VE testified that such a restriction would prohibit all work. (*Id.*). Further, the ALJ asked whether a hypothetical claimant who missed more than one day a month on a recurring basis could maintain competitive employment; the VE testified that employers "will accept no more than one absence per month and no more than a total of eight absences in a 12-month period of time." (Tr. 66-67). Finally, the VE testified that if the ALJ adopted all of Sharrard's asserted limitations, he could not perform competitive work, because of his asserted need to lie down and inability to leave home twice weekly due to gastrointestinal problems. (Tr. 67).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded

21

from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an

impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

24

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

G.    **Analysis**

Sharrard argues that the ALJ committed reversible error in the following ways: (1) failing to discuss the objective medical evidence in any way; (2) rejecting the opinions of Drs. Belen, Hines, and Kremer in violation of the Treating Physician rule, (3) failing to consider whether Sharrard was capable of a competitive work schedule; (4) failing to incorporate Sharrard's well supported limitations into her RFC assessment. The Court will address these arguments in turn.

25

#### 1.    *The ALJ Properly Discussed Objective Medical Evidence*

Sharrard first argues that the ALJ "does not give any rationale for her decision, only conclusory statements. There is no discussion of the objective medical evidence . . . no discussion of the factual basis for the decision, and not a single discussion in the decision of special factors such as medication side effects, fatigue, and restrictive lung disease." (Doc. 12 at 11). Curiously, Sharrard does not point to any particular piece of objective medical evidence which the ALJ failed to discuss, but rather simply makes a sweeping assertion that the ALJ did not discuss *any* objective medical evidence. A reading of the ALJ's opinion quickly dispels this misapprehension. The ALJ properly discussed numerous pieces of objective medical evidence, including normal findings during January and February 2013 physical examinations (Tr. 29-30), the results of pulmonary function studies (Tr. 30), and observations made by physicians regarding Sharrard's mental status (Tr. 30-32). While the ALJ did not cite to every piece of objective medical evidence, an "ALJ can consider all of the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Korneck v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir.2006) (internal quotations omitted).

#### 2.    *The ALJ Did Not Violate the Treating Physician Rule*

Sharrard next argues that the ALJ erred by "dismiss[ing] the treating physician opinions of Dr. Belen, D.O., Dr. Hines, M.D., and treating Psychiatrist Dr. Kremer, D.O., but noticeably never states anything substantial in which to substantiate a rejection of all the treating physicians." (Doc. 12 at 11).

With regard to Dr. Hines, Sharrard argues that the ALJ "outright rejects Dr. Hines simply because she could only count four office visits." (Doc. 12 at 12). Dr. Hines treated

Sharrard four times in 2011, in the months of May, June, July and October. (Tr. 286-92). Dr. Hines's May 7, 2011, RFC assessment limits Sharrard to lifting ten pounds occasionally, standing or walking for less than two hours, and sitting for less than six hours daily. (Tr. 239). Notably, this assessment appears to have been drafted prior to Dr. Hines's treatment of Sharrard, which began on May 18, 2011. (Tr. 292). This fact alone is sufficient to render Dr. Hines a non-treating physician for purposes of his RFC assessment. *See Kornecky*, 167 F. App'x at 506 ("The question is whether [the physician] had the ongoing relationship with [the claimant] to qualify as a treating physician at the time he rendered his opinion.")

Further, Sharrard's visits with Dr. Hines were fairly limited in scope: his May 18, 2011, visit appears to have been focused on refilling prescriptions (Tr. 292); his June 21, 2011, visit reflected prior complaints of chest pain, but did not include any assessment or treatment plan (Tr. 290-91); his July 27, 2011, visit was primarily focused on a non-severe, temporary rash (Tr. 288-98); and his October 20, 2011, visit again focused on prescription refills and discussing test results (Tr. 286-87). Even if Dr. Hines drafted his RFC assessment in the light of these visits, his treatment sessions with Sharrard were so limited in number and scope of ailments treated as to render him a non-treating source. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 n. 3 (6th Circ. 2011) ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is a treating source"); *Jackson v. Comm'r of Soc. Sec.*, No. 1:10-CV-1163, 2012 WL 1029261, at *9 (W.D. Mich. Mar. 26, 2012) (finding that a treating physician's opinion was not due its customary deference because the claimant treated with that physician only four times over two months, and because the physician's assessment was inconsistent with other medical evidence); *Meadows v. Comm'r of*

27

*Soc. Sec.*, No. 1:07CV1010, 2008 WL 4911243, at *14 (S.D. Ohio Nov. 13, 2008) (finding that an ALJ appropriately rejected a treating physician's opinion when the claimant was treated only nine times, and for a limited set of ailments which were not severe impairments).

Sharrard similarly argues that the ALJ erred in rejecting the opinion of Dr. Belen "because the ALJ stepping into the role of doctor determined that Plaintiff was no longer suicidal and had normal thought process [sic]." (Doc. 12 at 12). Sharrard further asserts that the ALJ "seems to take one or two lines throughout the voluminous medical records and runs with them . . . [t]here is absolutely no attempt to evaluate the medical records as a whole to make a reasoned decision." (*Id.*). Sharrard points to sections of the record which he suggests undermine the ALJ's decision, including complaints of being "anxious, severely depressed, racing thoughts, and suicidal [tendencies]," along with "'dry runs' of hanging himself." (*Id.*). However, given that Dr. Belen did not examine Sharrard's mental health, this assertion seems out of place. Sharrard also rather sharply alleges that "[t]here is not a scintilla of evidence to support this decision. The treating source opinion is not weighed nor discussed at all in the decision." (Doc. 12 at 13).

Dr. Belen's findings derive from two examinations. On November 16, 2011, Belen evaluated Sharrard's abnormal spirometry, finding that that his physical condition was generally normal, and that he experienced a moderate restrictive breathing defect with normal diffusing capacity, likely resulting from prior open heart surgery. (Tr. 361-62). Dr. Belen also noted that Sharrard was disabled on that date. (Tr. 362). Dr. Belen's April 30, 2012, examination revealed some dyspnea upon exertion; Dr. Belen also noted Sharrard's history of HIV, hypertension, and patent foramen ovule. (Doc. 359-60).

28

In her decision, the ALJ noted that Dr. Belen did not provide "any objective findings" to support his finding. (Tr. 31). While Dr. Belen does in fact cite objective evidence in his treatment notes, including Sharrard's blood pressure, heart rate, and respiratory rate (Tr. 359-62), he did not reference objective evidence sufficient to justify his assertion that Sharrard was disabled. Moreover, the ALJ does not owe any deference to a physician's opinion that a claimant is disabled, because this decision is reserved to the Commissioner. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 727 (6th Cir. 2014). Dr. Belen did not establish an RFC assessment or any other set of limitations for Sharrard, and like Dr. Hines, Dr. Belen's treatment of Sharrard is too scant to constitute the opinion of a treating physician. *See Helm*, 405 F. App'x at 1001 n.3. To whatever extent Sharrard might be viewed as arguing that the ALJ did not properly consider the necessary factors in assigning weight to Dr. Belen's opinion (*e.g.* length of treatment, supportability, consistency), the ALJ was obligated only to consider those factors, not to explicitly discuss each of them, *Burbo v. Comm'r of Soc. Sec.*, 877 F. Supp. 2d 526, 541 (E.D. Mich. 2012), and her assertion that "the undersigned has also considered opinion evidence in accordance with the requirements of 20 C.F.R. 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p" satisfies this requirement (Tr. 28).

With regard to Dr. Kremer, Sharrard does not explicitly describe how the ALJ erred in her consideration of that physician's findings, but it appears that his critique of the ALJ's treatment of Dr. Belen, who primarily examined Sharrard's physical condition, was in fact directed at Dr. Kremer, who primarily analyzed Sharrard's mental state. (Doc. 12 at 11).The ALJ does not discuss the weight given to Dr. Kremer's findings, which are referenced only once in the decision, and even then not by name. (Tr. 30). If Dr. Kremer was a treating

physician who rendered an opinion about Sharrard's mental health, the ALJ's failure to discuss the weight given to that opinion would likely constitute reversible error. *Wilson*, 378 F.3d at 547. However, there are serious questions about whether a physician who treats a patient only four times, for the purpose of reviewing medication, can be considered a treating physician. *See Helm*, 405 F. App'x at 1001 n.3; *Meadows*, 2008 WL 4911243, at *14.

Furthermore, Dr. Kremer's findings do not contain a medical opinion to which deference could be given. Instead, her treatment notes merely record Sharrard's subjective complaints (*see*, *e.g.*, Tr. 295, 304, 313, 555), include check-the-box observations about Sharrard's mental status (Tr. 296-97, 304-05, 312-13, 322-23), and (on two occasions) assess a GAF score (Tr. 308, 317). Dr. Kremer did not, for instance, draft a detailed assessment of activities which would be limited by Sharrard's mental illnesses, thus her notes do not constitute a medical opinion, relieving the ALJ of the duty to assign a particular weight to those findings. *See* 20 C.F.R. §§ 404.1527, 416.927(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."); *Winter v. Comm'r of Soc. Sec.*, No. 12-11962, 2013 WL 4604782, at *9 (E.D. Mich. Aug. 29, 2013) ("But Dr. Scaddan never opined on what he believed Winter could still do in view of her symptoms; in other words, he offered no opinion on his patient's ability to function."); *Arnold v. Astrue*, No. 2:10-CV-013, 2010 WL 5812957, at *7 (S.D. Ohio Oct. 7, 2010) (finding that an ALJ did not err by failing to give any weight to a psychologist's treatment notes and GAF score because such findings did not constitute "an actual opinion").

The ALJ thus did not violate the treating physician rule with regard to Drs. Hines, Belen, or Kremer, because those physicians were not treating physicians. Further, ALJ adequately discussed the opinions of Drs. Hines and Belen, and his failure to discuss Dr. Kremer's findings in detail is irrelevant because those notes do not contain a medical opinion.

>    3.    *The ALJ Did not Err by Failing to Specifically Assess Sharrard's Ability to Perform a Competitive Work Schedule*

Next, Sharrard argues that the ALJ erred by failing to "evaluate whether based on claimant's combined physical and mental limitations [he] is capable of a competitive work schedule i.e., 8 hour day, 40 hour work week." This contention is without merit because an RFC assessment by definition incorporates the ability of a claimant to perform work on a sustained basis. *See* SSR 96–9p ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis; i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."). The ALJ was thus not required to make a specific finding that Sharrard could perform a competitive work schedule.

>    4.    *The ALJ Properly Included All of Sharrard's Well Supported Limitations in Her RFC Assessment*

While Sharrard's argument is somewhat disjointed, it appears that he also intends to argue that the ALJ erred by failing to include several of his well-supported limitations in her RFC assessment. Sharrard variously asserts that the ALJ did not discuss "special factors such as medication side effects, fatigue, and restrictive lung disease" (Doc. 12 at 11), mischaracterized evidence which shows that he remains suicidal and mentally abnormal (*Id*. at 12), failed to adequately support her RFC assessment by reference to objective medical evidence (*Id.* at 15), failed to discuss his need to lie down, his concentration problems, severe

31

fatigue, severe diarrhea, muscle aches, and pain issues (*Id*. at 16).[10] Sharrard's allegation that the ALJ failed to discuss his subjective complaints is simply without merit. The ALJ specifically mentioned and considered Sharrard's complaints of "lightheadedness, shortness of breath, racing thoughts, and depression," along with his "difficulty sleeping through the night due to pain." (Tr. 29). Further, the ALJ mentioned his asserted need to nap during the day, headaches, emotional issues, and side-effects including feeling "crazy" or "high," difficulty paying attention, and drowsiness. (*Id*.). The ALJ also specifically discussed Sharrard's asserted activities of daily living, and asserted physical and mental limitations as enumerated in his testimony and function report. (*Id*.).

The ALJ compared Sharrard's asserted subjective symptoms to his "longitudinal medical history," and found that it "fail[ed] to provide strong support for his allegations of disabling symptoms and limitations." (Tr. 29). With regard to physical health, the ALJ noted that Sharrard showed excellent response to his HIV treatment (*id*., Tr. 475), that his diarrhea symptoms had resolved in the most recent medical records (*id*., Tr. 495), and that treatment notes from Dr. Belen are scant, and do not establish any physical limitations resulting from Sharrard's lung disorder (Tr. 30). Regarding Sharrard's mental health, the ALJ noted that he received regular therapy and treatment for bipolar disorder and generalized anxiety disorder, but also recognized that Sharrard's latter mental status exams showed some anxiousness and depression, but with "generally normal speech, attention and concentration, impulse control,

---

[10] Sharrard also makes a single-sentence reference to the ALJ's decision is "so lacking in discussion or rationale [that] it is a violation of Plaintiff's due process." (Doc. 12 at 17). This argument is undeveloped and perfunctory, and is thus waived. *See Brewer v. Comm'r of Soc. Sec.*, No. 13-14409, 2014 WL 6632176, at *13 (E.D. Mich. Nov. 21, 2014).

and judgment," and that recent treatment notes showed "no suicidal ideation and . . . normal thought process and content." (Tr. 30-31, 357-58, 619).

That Sharrard does not point to specific pieces of medical evidence inconsistent with this assessment is a testament to the accuracy of the ALJ's characterization of the medical evidence. The ALJ cannot be faulted for failing to consider medical records establish the disabling status of Sharrard's suicidal intent, fatigue, diarrhea, lung disorder, concentration problems, or emotional instability when no such records exist. Further, the ALJ actually established a more restrictive RFC assessment than that suggested by the state agency medical and psychological consultants, finding that Sharrard's anxiety and bipolar disorders cause moderate difficulties in social functioning and in terms of concentration, persistence, or pace, and establishing a fairly lengthy set of non-exertional limitations. (Tr. 28, 32).[11]

Thus, the ALJ properly discussed Sharrard's objective medical evidence, adequately addressed the opinions of Drs. Belen, Hines, and Kremer, properly considered whether Sharrard could complete a competitive work schedule, and properly discussed and incorporated Sharrard's well supported limitations into the RFC assessment.

## H.     Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Sharrard's Motion for Summary Judgment (Doc. 12) be **DENIED**, the Commissioner's Motion (Doc. 14) be **GRANTED**, and that this case be **AFFIRMED**.

---

[11] Sharrard make a second, single-sentence argument that "once a limitation is found, the ALJ is required to include such limitations in the RFC and discuss how those limitations affect the ability of Plaintiff to perform sustained work. The ALJ utterly failed to do so in his [sic] decision." (Doc. 12 at 16). Insofar as Sharrard intends to argue that there was a mismatch between the ALJ's hypothetical questions to the VE and the RFC she ultimately drafted in her decision, a quick examination of both confirms that they contain the same limitations. (Tr. 28, 64).

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: July 31, 2015                          S/ PATRICIA T. MORRIS
                                             Patricia T. Morris
                                             United States Magistrate Judge

## **CERTIFICATION**

        I hereby certify that the foregoing document was electronically filed this date through
the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: July 31, 2015                          By s/Kristen Krawczyk
                                             Case Manager to Magistrate Judge Morris